1  Jason C. Murray (CA Bar No. 169806)
   CROWELL & MORING LLP
2  515 South Flower St., 40th Floor
   Los Angeles, CA 90071
3  Telephone: 213-443-5582
   Facsimile: 213-622-2690
4  Email: jmurray@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile: 202-628-5116
Email: jhoward@crowell.com
       jmurphy@crowell.com

**ORIGINAL**
**F I L E D**

OCT 2 0 2009

**RICHARD W. WIEKING**
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

*E-filing*

*Counsel for Plaintiffs*

5  [Additional counsel listed on signature page]
6
7         **UNITED STATES DISTRICT COURT**
8   **NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**
9
10  AT&T MOBILITY LLC; AT&T CORP.; AT&T
    SERVICES, INC.; BELLSOUTH
    TELECOMMUNICATIONS, INC.; PACIFIC
11  BELL TELEPHONE COMPANY; AT&T
    OPERATIONS, INC.; AT&T DATACOMM,
12  INC.; SOUTHWESTERN BELL TELEPHONE
    COMPANY,
13
             Plaintiffs,
14
         v.
15
16  AU OPTRONICS CORPORATION; AU
    OPTRONICS CORPORATION AMERICA,
17  INC; CHI MEI CORPORATION; CHI MEI
    OPTOELECTRONICS CORPORATION; CHI
    MEI OPTOELECTRONICS USA, INC.; CMO
18  JAPAN CO. LTD.; NEXGEN MEDIATECH,
    INC.; NEXGEN MEDIATECH USA, INC.;
19  CHUNGHWA PICTURE TUBES LTD.;
    TATUNG COMPANY OF AMERICA, INC.;
20  EPSON IMAGING DEVICES
    CORPORATION; EPSON ELECTRONICS
21  AMERICA, INC.; HANNSTAR DISPLAY
    CORPORATION; LG DISPLAY CO. LTD.; LG
22  DISPLAY AMERICA, INC.; SAMSUNG
    ELECTRONICS CO., LTD.; SAMSUNG
23  SEMICONDUCTOR, INC.; SAMSUNG
    ELECTRONICS AMERICA, INC.; SHARP
24  CORPORATION; SHARP ELECTRONICS
    CORPORATION; TOSHIBA CORPORATION;
25  TOSHIBA AMERICA ELECTRONICS
    COMPONENTS, INC.; TOSHIBA MOBILE
26  DISPLAY TECHNOLOGY CO., LTD.;
    TOSHIBA AMERICA INFORMATION
27  SYSTEMS, INC.,
28
             Defendants.

CASE NO.  M 07-1827 SI

MDL No. 1827

CV 09        4997        MEJ

**COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

VIA FAX

COPY

1

Plaintiffs AT&T Mobility LLC ("AT&T Mobility"), AT&T Corp., AT&T Services, Inc., Bellsouth Telecommunications, Inc., Pacific Bell Telephone Company, AT&T Operations, Inc., AT&T Datacomm, Inc., and Southwestern Bell Telephone Company (plaintiffs other than AT&T Mobility are hereinafter referred to as "AT&T") for their Complaint against all defendants named herein, hereby allege as follows:

## I.     **INTRODUCTION**

1.     This case arises out of a long-running conspiracy extending at a minimum from at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), among defendants and their co-conspirators, with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for liquid crystal display panels ("LCD Panels") (defined below).

2.     Defendants and their co-conspirators formed an international cartel illegally to restrict competition in the United States in the market for LCD Panels. During the Conspiracy Period, the conspiracy affected billions of dollars of commerce in California and throughout the United States. The conspiracy included communications and meetings in which defendants agreed to eliminate competition and fix the prices of LCD Panels that were ultimately incorporated into LCD Products (defined below) that they knew would be sold in California and the United States.

3.     At least four LCD Panel manufacturers, defendants LG Display Co. Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.), Sharp Corporation, Chunghwa Picture Tubes, Ltd. and Epson Imaging Devices Corporation, have admitted to participating in this conspiracy. On or about November 12, 2008, LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels. On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.

4.     Defendants engaged in conspiratorial conduct both within and outside the United States. Defendants' conduct in the United States was centered in California. Defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. all admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California. Each

2

1   agreed that: "Acts in furtherance of this conspiracy were carried out within the Northern District of

2   California. TFT-LCD affected by this conspiracy was sold by one or more of the conspirators to

3   customers in this District." Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-

4   1 at 5; Case 3:08-cr-00804, Document 10-1 at 4. Defendant LG Display America, Inc., which admitted

5   to participating in the conspiracy, maintains its principal place of business in San Jose, California.

6   Similarly, defendants Chunghwa Picture Tubes, Ltd. and Epson Imaging Devices Corporation, which

7   also admitted to participating in the conspiracy, used California corporations with principal places of

8   business in Long Beach, California (defendants Tatung Company of America, Inc. and Epson

9   Electronics America, Inc. respectively), as their sales agents in the United States for LCD Products

10   containing LCD Panels which were affected by the conspiracy. Many of the other defendants also

11   maintained offices and operations in California during the Conspiracy Period, including AU Optronics

12   Corporation America, Inc., Chi Mei Optoelectronics USA, Inc., Nexgen Mediatech USA, Inc., Samsung

13   Semiconductor, Inc., Toshiba America Electronic Components, Inc., and Toshiba America Information

14   Systems, Inc. Communications in furtherance of the conspiracy occurred within California and between

15   California and other states.

16       5.       AT&T Mobility is a provider of mobile wireless telecommunications services and sells

17   mobile wireless handsets to its customers. During the Conspiracy Period, AT&T Mobility purchased

18   more than 300 million mobile wireless handsets for resale to customers. As a result of defendants'

19   conspiracy to fix the price of LCD Panels, the prices of these handsets containing LCD Panels also were

20   artificially inflated. Defendants' conspiracy also raised the price of LCD Panels incorporated into the

21   LCD Products AT&T Mobility purchased for its own internal use during the Conspiracy Period, such as

22   desktop computer monitors and notebook computers, and therefore artificially inflated the price of such

23   LCD Products. AT&T Mobility thus suffered damages as a result of defendants' conspiracy, and brings

24   this action to recover the overcharges paid for the mobile wireless handsets and other LCD Products it

25   purchased during the Conspiracy Period.

26       6.       AT&T is a provider of voice and data communications services, including traditional

27   local and long-distance voice services, internet access services, private enterprise network services, and

28   other telecommunications services. One of the AT&T companies which was injured as a result of the

conspiracy is Pacific Bell Telephone Company, a California corporation, which has provided voice and data telecommunications services to the vast majority of the people of California for nearly a century. During the Conspiracy Period, AT&T purchased LCD Products, such as desktop computer monitors and notebook computers, for its own internal use. Defendants' conspiracy raised the price of the LCD Panels incorporated into these LCD Products and therefore artificially inflated the price of the LCD Products. AT&T thus suffered damages as a result of defendants' conspiracy and brings this action to recover the overcharges paid for LCD Products during the Conspiracy Period.

7.      AT&T Mobility and AT&T bring this action seeking injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover damages under Section 4 of the Clayton Act, California's Cartwright Act, and other state laws identified herein, as well as to recover the costs of suit, including reasonable attorneys fees, for the injuries that AT&T Mobility and AT&T suffered as a result of defendants' conspiracy to fix, raise, maintain and stabilize the prices of LCD Panels.

## II.      JURISDICTION AND VENUE

8.      AT&T Mobility brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages for its direct purchases of LCD Panels from certain defendants. In addition, AT&T Mobility and AT&T bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all defendants.

9.      AT&T Mobility and AT&T also bring this action pursuant to Section 16750(a) of the California Business and Professions Code, for injunctive relief and treble damages that AT&T Mobility and AT&T sustained due to defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California Business and Professions Code (the "Cartwright Act"). AT&T Mobility's and AT&T's claims also are brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from and an injunction against defendants due to their violations of Section 17200 *et seq.* of the California Business and Professions Code (the "Unfair Competition Act").

10.      While all of AT&T Mobility's and AT&T's claims are actionable under the law of

California, in the alternative, they also bring this action pursuant to the antitrust and/or unfair competition laws of Arizona, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Puerto Rico, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.  As nationwide corporations doing a substantial volume of business in each of the above-mentioned states, AT&T Mobility and AT&T are, in the alternative, entitled to the protection of the antitrust and/or unfair competition laws of each of these states.

11.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 over AT&T Mobility's and AT&T's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  The Court has supplemental jurisdiction over AT&T Mobility's and AT&T's claims under the Cartwright Act and, in the alternative, under the other state antitrust and/or unfair competition laws set forth below under 28 U.S.C. § 1367.  AT&T Mobility's and AT&T's state law claims are so related to their claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

12.     The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in California, and, in the alternative, on commerce within each of the other states identified herein.  This effect gives rise to AT&T Mobility's and AT&T's antitrust claims.  During the Conspiracy Period, defendants' conspiracy affected the price of LCD Panels and LCD Products AT&T Mobility and AT&T purchased in the United States, which moved through, were sold in, or used in California and, in the alternative, in each of the other states identified herein.

13.     This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each defendant conducts substantial business in the state of California, and a number of defendants maintain their headquarters in this District or elsewhere in California.  In addition, defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured LCD Panels and LCD Products for sale in the United States and California and several defendants have admitted that they

1  engaged in conduct in furtherance of the conspiracy in the Northern District of California.

2      14.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and

3  28 U.S.C. § 1391 because each defendant is either an alien corporation, transacts business in this

4  District, or is otherwise found within this District. In addition, venue is proper in this District under 28

5  U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in

6  this district.

7      15.    Because AT&T Mobility's and AT&T's action is related to the *In re TFT-LCD Antitrust*

8  *Litigation* action, Case No. M:07-cv-1827 SI, the action will be assigned to the San Francisco division,

9  Judge Susan Illston presiding. This action concerns substantially the same parties, transactions and

10  events as Case No. M:07-cv-1827 SI insofar as it involves a suit for damages and injunctive relief

11  arising out of defendants' conspiracy to fix the price of liquid crystal display ("LCD") panels in

12  violation of the Sherman Act and the laws of California and other states. Pursuant to Pretrial Order #1

13  in M:07-cv-1827 SI, this case is automatically consolidated with M:07-cv-1827 SI for all pretrial

14  proceedings without any further motion or order.

15  **III.    DEFINITIONS**

16      16.    As used herein, the term "LCD Panel" means liquid crystal display panel. LCD Panels

17  use glass plates and a liquid crystal compound to electronically display an image. The technology

18  involves sandwiching a liquid crystal compound between two glass plates called "substrates." The

19  resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an

20  image. During the Conspiracy Period, LCD Panels used in hand-held devices included three different

21  technologies: thin film transistor (TFT) panels, color super-twist nematic (CSTN) panels, and

22  monochrome super-twist nematic (MSTN) panels. The price-fixing conspiracy alleged herein had the

23  effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and

24  MSTN technology in LCD Products, including mobile wireless handsets and two-way radios.

25      17.    As used herein, the term "LCD Products" means any product containing an LCD Panel,

26  including without limitation mobile wireless handsets (including voice, data, and combination voice and

27  data devices), computer monitors, notebook and laptop computers, and televisions ("TVs").

28      18.    As used herein, the term "OEM" means any original equipment manufacturer of an LCD

1  Product.

2       19.    As used herein, the term "Conspiracy Period" refers to the time period beginning January

3  1, 1996 and continuing at least until December 11, 2006.

4  **IV.**    **THE PARTIES**

5      **A.**    **Plaintiffs**

6         **1.**    **AT&T Mobility**

7       20.    AT&T Mobility is a Delaware limited liability company with its principal place of

8  business at 1025 Lenox Park Boulevard in Atlanta, Georgia. AT&T Mobility is a wholly-owned

9  subsidiary of AT&T Inc. AT&T Mobility is one of the largest national providers of mobile wireless

10  telecommunications services in the United States, with over 78 million subscribers and a wireless

11  network providing nationwide wireless coverage. Before 2007, AT&T Mobility was named Cingular

12  Wireless LLC ("Cingular"). During the Conspiracy Period, AT&T Mobility purchased mobile wireless

13  handsets and other LCD Products containing LCD Panels manufactured and sold by defendants, their

14  co-conspirators, and others. As a result of defendants' conspiracy, AT&T Mobility, has been injured in

15  its business and property because the prices it paid for such LCD Products were artificially inflated by

16  defendants' conspiracy.

17       21.    During and after the Conspiracy Period, AT&T Mobility acquired or received the stock

18  of companies that also purchased mobile wireless handsets and other LCD Products containing LCD

19  Panels manufactured and sold by defendants, their co-conspirators, and others. As a result of

20  defendants' conspiracy, these companies were injured in their business and property because the prices

21  they paid for mobile wireless handsets and other LCD Products were artificially inflated by defendants'

22  conspiracy. By acquiring or receiving a contribution of the stock of companies that purchased mobile

23  wireless handsets and other LCD Products containing LCD Panels, AT&T Mobility obtained all claims

24  and rights under federal and state laws to recover any overcharges suffered by those companies. As

25  used herein, "AT&T Mobility" refers to AT&T Mobility LLC, f/k/a Cingular Wireless LLC, as well as

26  any company that purchased mobile wireless handsets during the Conspiracy Period whose stock was

27  acquired or obtained by AT&T Mobility LLC.

28       22.    Throughout the Conspiracy Period, AT&T Mobility conducted a substantial amount of

1    business in California.  During the Conspiracy Period, AT&T Mobility sold mobile wireless handsets

2    containing LCD Panels to consumers in California through its corporate-owned retail stores, through

3    independent retailers located in California, and to California consumers through its website on the

4    Internet.  In addition, AT&T Mobility sold mobile wireless handsets directly to business, government

5    and other customers in California.

6         23.     Throughout the Conspiracy Period, AT&T Mobility maintained in California significant

7    inventories of mobile wireless handsets containing LCD Panels manufactured by defendants, their co-

8    conspirators, and others.  Beginning in 2001, after the formation of Cingular, AT&T Mobility

9    maintained inventories of mobile wireless handsets in California worth many million of dollars.  During

10   the Conspiracy Period, AT&T Mobility's policy was to maintain mobile wireless handsets amounting to

11   at least 17 days worth of sales in each retail location in California.

12        24.     In the alternative, AT&T Mobility also conducted substantial business in the other states

13   referred to herein in sales of LCD Products, including through corporate-owned retail stores, through

14   independent retailers located in those states, through its website, and through sales to businesses,

15   government and other customers in those states.

16              **2.    AT&T**

17        25.     AT&T Inc. is a holding company organized under the laws of Delaware and having its

18   principal place of business in Dallas, Texas.  AT&T Inc. is the parent corporation of the following

19   subsidiaries and affiliates:  AT&T Corp., a corporation organized under the laws of New York and

20   having its principal place of business in Bedminster, New Jersey; AT&T Services, Inc., f/k/a SBC

21   Services, Inc., a corporation organized under the laws of Delaware and having its principal place of

22   business in Dallas, Texas; BellSouth Telecommunications, Inc., a corporation organized under the laws

23   of Georgia and having its principal place of business in Atlanta, Georgia; Pacific Bell Telephone

24   Company, a corporation organized under the laws of California and having its principal place of

25   business in San Francisco, California; AT&T Operations, Inc., f/k/a SBC Operations, Inc., a corporation

26   organized under the laws of Delaware and having its principal place of business in San Antonio, Texas;

27   AT&T DataComm, Inc. f/k/a SBC DataComm, Inc., a corporation organized under the laws of Delaware

28   and having its principal place of business in Chicago, Illinois; and Southwestern Bell Telephone

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  Company, a corporation organized under the laws of Missouri and having its principal place of business

2  in Dallas, Texas. These entities are collectively referred to as "AT&T."

3        26.    During the Conspiracy Period, each of the entities described in the preceding paragraph

4  purchased LCD Products, including desktop computer monitors and notebook computers, that contained

5  LCD Panels affected by defendants' price fixing conspiracy.

6        27.    During the Conspiracy Period, BellSouth Affiliates Services Corp., a corporation

7  organized under the laws of Georgia, BellSouth Technology Group, Inc., a corporation organized under

8  the laws of Georgia, and BellSouth Technology Services, Inc., a corporation organized under the laws of

9  Georgia purchased LCD Products that contained LCD Panels affected by defendants' conspiracy. Since

10  the end of the Conspiracy Period, plaintiff AT&T Services, Inc. has acquired all rights of each of these

11  entities, including all rights under federal and state antitrust laws to recover overcharges arising from

12  purchases of LCD Products that contained LCD Panels affected by defendants' conspiracy. Also during

13  the Conspiracy Period, Southwestern Bell Telephone L.P., a limited partnership organized under the

14  laws of Texas, purchased LCD Products that contained LCD Panels affected by defendants' conspiracy.

15  Since the end of the Conspiracy Period, plaintiff Southwestern Bell Telephone Company has acquired

16  all rights of Southwestern Bell Telephone L.P., including all rights under federal and state antitrust laws

17  to recover overcharges arising from the purchases of LCD Products that contained LCD Panels affected

18  by defendants' conspiracy.

19        28.    Throughout the Conspiracy Period, AT&T conducted a substantial amount of business in

20  California. Plaintiff Pacific Bell Telephone Company provided local exchange telecommunications

21  services throughout California and maintained its headquarters in San Francisco for nearly 100 years. In

22  addition, AT&T provided various wireline telecommunications services to consumers, businesses and

23  government customers in many of the other states listed herein, where AT&T employees used notebook

24  computers and desktop monitors purchased by AT&T.

25      **B.**    **Defendants**

26        **1.**    **AU Optronics**

27        29.    Defendant AU Optronics Corporation is one of the world's largest manufacturers of LCD

28  Panels, with its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078,

1    Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed

2    LCD Panels incorporated into LCD Products sold in the United States.

3        30.    Defendant AU Optronics Corporation America, Inc. is a wholly-owned and controlled

4    subsidiary of defendant AU Optronics Corporation, with its corporate headquarters at 9720

5    Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and Cupertino,

6    California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or

7    distributed LCD Panels incorporated into LCD Products sold in the United States.

8        31.    Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc. are

9    referred to collectively herein as "AU Optronics."  The AU Optronics companies were members of the

10   conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through

11   the actions of their respective officers, employees, and representatives acting with actual or apparent

12   authority.  Alternatively, defendant AU Optronics Corporation America, Inc. was a member of the

13   conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of AU Optronics

14   Corporation.  AU Optronics Corporation dominated or controlled AU Optronics Corporation America,

15   Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices

16   for LCD Panels.

17            2.    **Chi Mei**

18       32.    Defendant Chi Mei Corporation is another of the world's largest manufacturers of LCD

19   Panels, with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717,

20   Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed

21   LCD Panels incorporated into LCD Products sold in the United States.

22       33.    Defendant Chi Mei Optoelectronics Corporation is another of the largest manufacturers

23   of LCD Panels and a wholly-owned subsidiary of Chi Mei Corporation, with its global headquarters at

24   No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147

25   Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed

26   LCD Panels incorporated into LCD Products sold in the United States.

27       34.    Defendant Chi Mei Optoelectronics USA, Inc., f/k/a International Display Technology

28   USA, Inc. is a wholly-owned and controlled subsidiary of Chi Mei Corporation, with its corporate

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  headquarters at 101 Metro Drive Suite 510, San Jose, California. During the Conspiracy Period, said

2  defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products

3  sold in the United States.

4       35.    Defendant CMO Japan Co., Ltd., f/k/a International Display Technology, Ltd. is a

5  subsidiary of Chi Mei Corporation, with its principal place of business located at Nansei Yaesu Bldg.

6  3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. During the Conspiracy Period, said defendant

7  manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the

8  United States.

9       36.    Defendant Nexgen Mediatech, Inc. ("Nexgen") is a wholly-owned and controlled

10  subsidiary of Chi Mei Corporation with its principal place of business at No. 11-2, Jen Te 4th St., en Te

11  Village Jen Te, Tainan 717 Taiwan. During the Conspiracy Period, said defendant marketed, sold

12  and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation in the United

13  States.

14       37.    Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a wholly-owned and

15  controlled subsidiary of Chi Mei Corporation with its principal place of business at 16712 East Johnson

16  Drive, City of Industry, California. During the Conspiracy Period, said defendant marketed, sold and/or

17  distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation in the United States.

18       38.    Defendants Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei

19  Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA are referred to collectively

20  herein as "Chi Mei." The Chi Mei companies were members of the conspiracy that is the subject of this

21  Complaint by virtue of their participation in the conspiracy through the actions of their respective

22  officers, employees, and representatives acting with actual or apparent authority. Alternatively,

23  defendants Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co.,

24  Ltd., Nexgen, and Nexgen USA were members of the conspiracy by virtue of their status during the

25  Conspiracy Period as the alter egos or agents of Chi Mei Corporation. Chi Mei Corporation dominated

26  or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan

27  Co., Ltd., Nexgen, and Nexgen USA regarding conspiracy activities and used that domination or control

28  to charge artificially high prices for LCD Panels.

### 3.  Epson

39.  Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan.  The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation.  Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.  During the Conspiracy Period, Epson Japan manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

40.  Defendant Epson Electronics America, Inc. ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson Corporation.  Its principal place of business is at 2580 Orchard Parkway, San Jose, California.  During the Conspiracy Period, Epson America sold and distributed LCD Products containing LCD Panels manufactured by Epson Japan to customers in the United States.

41.  Defendants Epson Japan and Epson America are referred to collectively herein as "Epson."  The Epson companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant Epson America was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and LCD Products.

### 4.  Chunghwa

42.  Defendant Chunghwa Picture Tubes Ltd. ("Chunghwa") is a leading manufacturer of LCD Panels, with its global headquarters at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan.  Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.  Chunghwa's Board of Directors includes representatives from Tatung Company.  The Chairman of Chunghwa, Weishan Lin, is also the Chairman and General Manager of the

1  Tatung Company. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or

2  distributed LCD Panels incorporated into LCD Products sold in the United States.

3       43.    Defendant Tatung Company of America, Inc. ("Tatung America") is a California

4  corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California.

5  Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns approximately

6  half of Tatung America. The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's

7  former Chairman, T.S. Lin. During the Conspiracy Period, Tatung America sold and distributed LCD

8  Products manufactured by Chunghwa Picture Tubes, Ltd. to customers throughout the United States.

9       44.    Defendants Chunghwa and Tatung America are referred to collectively herein as

10  "Chunghwa." During the Conspiracy Period, Chunghwa and Tatung were closely affiliated, commonly

11  owned, controlled and dominated by Tatung Corporation, and functioned as a single enterprise and/or

12  alter egos.

13         **4.**    **HannStar**

14       45.    Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its

15  headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. During the

16  Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels

17  incorporated into LCD Products sold in the United States.

18         **5.**    **LG Display**

19       46.    Defendant LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd. is a leading

20  manufacturer of LCD Panels and is a joint venture created in 1999 by defendants Royal Philips

21  Electronics NV and LG Electronics. LG Display Co., Ltd. maintains offices within this District in San

22  Jose, California and has its principal place of business located at 20 Yoido-dong, Youngdungpo-gu,

23  Seoul, 150-72 1, Republic of Korea. During the Conspiracy Period, said defendant manufactured,

24  marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

25       47.    Defendant LG Display America, Inc. f/k/a/ LG Philips LCD America, Inc. is located at

26  150 East Brokaw Rd., San Jose, CA 95112. During the Conspiracy Period, said defendant

27  manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the

28  United States.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

48.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to collectively herein as "LG Display."  Defendants LG Display Co., Ltd. and LG Display America, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### 6.     Samsung

49.     Defendant Samsung Electronics Co., Ltd. is located at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

50.     Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

51.     Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd., with its principal place of business at 3655 North First Street, San Jose, California 95134.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

52.     Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."  Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendants Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. were

1  members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or

2  agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled

3  Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. regarding conspiracy activities

4  and used that domination or control to charge artificially high prices for LCD Panels.

5            **7.**    **<u>Sharp</u>**

6       53.    Defendant Sharp Corporation, is located at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-

7  8522, Japan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or

8  distributed LCD Panels and LCD Products sold in the United States.

9       54.    Defendant Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of

10  Sharp Corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey, 07430.

11  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD

12  Panels and LCD Products sold in the United States.

13       55.    Defendants Sharp Corporation and Sharp Electronics Corporation are referred to

14  collectively herein as "Sharp." Defendants Sharp Corporation and Sharp Electronics Corporation were

15  members of the conspiracy that is the subject of this Complaint by virtue of the actions of their

16  respective officers, employees, and representatives acting with actual or apparent authority.

17  Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its

18  status during the Conspiracy Period as the alter ego or agent of Sharp Corporation. Sharp Corporation

19  dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that

20  domination or control to charge artificially high prices for LCD Panels.

21            **8.**    **<u>Toshiba</u>**

22       56.    Defendant Toshiba Corporation is located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo,

23  105-8001, Japan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or

24  distributed LCD Panels and LCD Products sold in the United States.

25       57.    Defendant Toshiba Mobile Display Co., Ltd., f/k/a Toshiba Matsushita Display

26  Technology Co., Ltd. is located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-

27  0075, Japan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or

28  distributed LCD Panels and LCD Products sold in the United States.

58.     Toshiba America Electronic Components, Inc. is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation with its corporate headquarters at 19900 MacArthur Blvd., Ste. 400, Irvine, CA 92612.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

59.     Defendant Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc. with its principal place of business at 9470 Irvine Boulevard, Irvine, California.  During the Conspiracy Period, Toshiba America Information Systems, Inc. manufactured, marketed, sold and/or distributed LCD Products in the United States.

60.     Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."  Defendants Toshiba Corporation, Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

**C.     Co-Conspirators**

61.     The actions in this Complaint were authorized, ordered, or done by defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

62.     Each defendant acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein.  Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products made

1   by its parent company.

2       63.    Various persons and entities participated as co-conspirators in the violations alleged

3   herein and performed acts and made statements in furtherance thereof.  These co-conspirators are

4   believed to include, without limitation, LG Electronics, Inc., LG Electronics USA, Inc., Hydis

5   Technologies Co., Ltd., NEC LCD Technologies, Ltd., Royal Philips Electronics N.V., Philips

6   Electronics North America Corp., Ltd., IPS Alpha Technology, Ltd., Mitsui & Co., Ltd., Mitsubishi

7   Electric Corporation, Panasonic Corporation, and Panasonic Corporation of North America.

8       64.    The acts charged in this Complaint have been done by defendants and their co-

9   conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or

10  representatives while actively engaged in the management of each defendant's business or affairs.

11      65.    Each defendant named herein acted as the agent or joint venturer of or for the other

12  defendants with respect to the acts, violations and common course of conduct alleged herein.  Each

13  defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels made by

14  its parent company.

15  **V.**    **TRADE AND COMMERCE AFFECTED BY CONSPIRACY**

16      **A.**    **LCD Panels**

17      66.    LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile

18  wireless handsets, digital cameras, and numerous other electronic products.  LCD Panels were the

19  principal form of display screen used in desktop computer monitors, laptop computers and mobile

20  wireless handsets during the Conspiracy Period.

21      67.    LCD Panels use liquid crystal to control the passage of light.  More specifically, an LCD

22  Panel is made of two glass sheets sandwiching a layer of liquid crystal.  When voltage is applied, the

23  liquid crystal is bent, allowing light to pass through to form a pixel.  The combination of these pixels

24  forms an image on the panel.

25      **B.**    **Structure of the LCD Panel Industry**

26      68.    The LCD Panel industry has several characteristics that facilitated a conspiracy to fix

27  prices, including high concentration, significant barriers to entry, homogeneity of products,

28  consolidation, multiple interrelated business relationships and ease of information sharing.

69.     The LCD Panel industry is highly concentrated and thus conducive to collusion. Throughout the Conspiracy Period, defendants collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

70.     The LCD industry is characterized by high barriers to entry. New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements require constant research and development and investment. Thus, firms cannot enter the market for the production and sale of LCD Panels without an enormous capital investment.

71.     LCD Panels, whether incorporated into mobile wireless handsets or desktop monitors, notebook computers and TVs, are manufactured to a specific size, regardless of manufacturer. The manufacture of standard panel sizes for products containing LCD Panels across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables them to enforce their conspiracy.

72.     The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by: (a) AU Optronics' acquisition of Quanta Display in 2006; (b) the creation in 2001 of AU Optronics itself through the merger of Acer Display and Unipac Electronics; (c) Fujitsu Limited's transfer of its LCD business to Sharp in 2005; (d) the merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd., in 2002; and (e) the joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita in 2004.

73.     Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry. Using the otherwise legitimate cover of joint ventures, cross licenses, and other cooperative arrangements, defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels with the numerous meetings described hereinafter.

74.     There were many opportunities for defendants to discuss and exchange competitively-sensitive information with their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators

18

1   was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took

2   advantage of these opportunities to discuss and agree upon their pricing of LCD Panels and monitor

3   each other's compliance with their agreement.

4         **C.**    **The Market For LCD Panels**

5         75.    LCD Panels have no independent utility, and have value only as components of LCD

6   Products, such as mobile wireless handsets, desktop computer monitors, notebook computer displays

7   and TVs.  The demand for LCD Panels thus derives directly from the demand for LCD Products.

8         76.    The market for LCD Panels is enormous, in part because of the extraordinarily high

9   demand for mobile wireless handsets and other LCD Products.  For example, demand for mobile

10  wireless handsets grew exponentially during the Conspiracy Period.  In 1997, worldwide shipments of

11  mobile wireless handsets totaled approximately 100 million units.  This number ballooned to over one

12  billion units by 2006.  This increased demand for mobile wireless handsets drove a similar increase in

13  the demand for LCD Panels during the Conspiracy Period.  Shipments of LCD Panels for mobile

14  wireless handsets grew from approximately 400 million panels in 2001 to over a billion panels in 2006.

15        77.    The market for LCD Panels and LCD Products are inextricably linked and intertwined

16  because the LCD Panel market exists to serve the markets for LCD Products.  The market for LCD

17  Panels and for LCD Products are, for all intents and purposes, inseparable in that one would not exist

18  without the other.

19        78.    AT&T Mobility participated in the market for LCD Panels during the Conspiracy Period

20  through its purchases of mobile wireless handsets, notebook computers and desktop computer monitors

21  containing LCD Panels at artificially inflated prices caused by defendants' conspiracy.

22        79.    AT&T participated in the market for LCD Panels through its purchases of desktop

23  computer monitors and notebook computers containing LCD Panels at artificially inflated prices caused

24  by defendants' conspiracy.

25  **VI.**    **VIOLATIONS ALLEGED**

26        80.    Beginning at a date as yet unknown to AT&T Mobility and AT&T, but at least as early as

27  January 1, 1996 and continuing thereafter up to and including December 11, 2006 at a minimum,

28  defendants and their co-conspirators agreed, combined, and conspired to raise, maintain, and stabilize at

1   artificial levels the prices at which LCD Panels were sold directly and indirectly to AT&T Mobility and

2   AT&T in the United States.

3       81.    Defendants, through their officers, directors and employees, effectuated a contract,

4   combination, trust, or conspiracy between themselves and their co-conspirators by, among other things:

5         a.    Participating in meetings and conversations to discuss the prices and supply of

6             LCD Panels in the United States;

7         b.    Agreeing to fix the prices and limit the supply of LCD Panels sold in the United

8             States in a manner that deprived AT&T Mobility and AT&T of free and open

9             competition as direct and indirect purchasers;

10        c.    Issuing price announcements and quotations in accordance with the agreements

11            reached; and

12        d.    Selling LCD Panels both directly and indirectly to AT&T Mobility and AT&T in

13            the United States at fixed, non-competitive prices.

14  **A.**    **Defendants' Agreements To Set Prices And Limit Production**

15      82.    The LCD Panel conspiracy alleged herein was effectuated through a combination of

16  group and bilateral discussions that took place in Japan, South Korea, Taiwan and in California and

17  elsewhere in the United States.  In the early years, beginning in at least 1996, representatives of the

18  Japanese defendants such as Sharp and Toshiba met and agreed to fix the prices for LCD Panels

19  generally, as well as to specific OEMs; they also agreed to limit the amount of LCD Panels each would

20  produce.

21      83.    In the early years, when the conspiracy was principally limited to the Japanese

22  defendants, bilateral discussions were the preferred method of communication.  As more manufacturers

23  entered the conspiracy, however, group meetings became more prevalent.

24      84.    As LCD Panel production in South Korea began to increase and become more

25  sophisticated, the Japanese defendants expanded their meetings to include their South Korean

26  competitors, including defendants LG Display and Samsung, both of which also agreed to fix prices and

27  control supply.  At or about the same time, the Japanese defendants began to partner with those

28  defendants located in Taiwan and Japanese engineers were lent to Taiwanese firms, and Taiwanese

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  output was shipped to Japan.

2     85.    At least as early as 2001, the South Korean defendants convinced Taiwanese LCD Panel

3  manufacturers, including defendants AU Optronics, Chi Mei, Chunghwa and HannStar, to join the

4  conspiracy to fix prices and control supply.  Defendants' conspiracy included agreements on the prices

5  at which certain defendants would sell LCD Panels and LCD Products to their own corporate

6  subsidiaries and affiliates that manufactured LCD Products, thereby ensuring that LCD Panel prices

7  remained the same as between defendants and their OEM customers, both of which manufactured and

8  sold LCD Products to AT&T Mobility and AT&T.

9       1.     **"Crystal Meetings"**

10    86.    In early 2001, high-level employees of at least two large manufacturers of LCD Panels

11  met in person and agreed to engage in periodic meetings to exchange sensitive competitive information

12  and to fix the price of LCD Panels and limit their production.  From early 2001 through at least 2006,

13  officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and

14  Sharp, met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases,

15  production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or

16  fixing LCD Panel prices and limiting their production.  The group meetings these defendants

17  participated in were called "Crystal Meetings."  Each defendant attended multiple meetings with one or

18  more of the other defendants during this period.  The Crystal Meetings occurred in Taiwan; other similar

19  meetings took place in South Korea, Japan, and in California and elsewhere in the United States on a

20  regular basis throughout this period.

21    87.    The Crystal Meetings were highly organized and followed a set pattern.  Meetings among

22  defendants' high-level executives were called "CEO" or "Top" meetings; while those among

23  defendants' vice presidents and senior sales executives were called "Commercial" or "Operational"

24  meetings.  As described below, the conspiracy also included "working level" meetings and

25  communications.

26    88.    The "CEO" meetings occurred quarterly from approximately 2001 to 2006.  The purpose

27  and effect of these meetings was to stabilize or raise prices.  Each meeting followed the same general

28  pattern, with a rotating designated "chairman" who would use a projector or whiteboard to show the

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

participants figures relating to the supply, demand, production, and prices of LCD Panels for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

89. The structure of "Commercial" meetings was largely the same as "CEO" meetings. These meetings took place more frequently than "CEO" meetings and occurred approximately monthly.

90. During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and, thereafter, reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels. Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

91. During these CEO and Commercial meetings, defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, reached agreement concerning the amounts each would produce. Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

92. During these CEO and Commercial meetings, defendants also agreed to conceal the fact and substance of the meetings, and, in fact, took various steps to do so. Top executives and other officials attending these meetings were instructed on more than one occasion to not disclose the fact of these meetings to outsiders, or even to other employees of defendants not involved in LCD Panel pricing or production. On at least one occasion of which AT&T Mobility and AT&T are aware, top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to such a meeting.

93. The structure of the so-called "Working Level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal. The purpose of the "Working Level" meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to those individuals with pricing

1   authority, which facilitated implementation of the conspiracy and effectuated the agreements made at the

2   CEO meetings and at the Commercial meetings.

3        94.     In approximately the summer of 2006, when they began to have concerns about antitrust

4   issues, defendants discontinued the Working Level meetings in favor of one-on-one meetings to

5   exchange pricing and supply information.  The meetings were coordinated so that on the same date, each

6   competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had

7   met with each other.  These Round Robin meetings took place until at least November or December of

8   2006.  The information obtained at these meetings was transmitted up the corporate reporting chain to

9   permit defendants to maintain their price-fixing and production-limitation agreement.

10           **2**      **Bilateral Discussions**

11        95.     During the Crystal Meetings, defendants also agreed to engage in bilateral

12   communications with those defendants not attending these meetings.  Certain defendants were

13   "assigned" other defendants not in attendance and agreed to and did in fact communicate with non-

14   attending defendants to synchronize the price and production limitations agreed to at the Crystal

15   Meetings.  Participants at the Crystal meetings contacted Japanese defendants (such as Sharp and

16   Toshiba) to relay the agreed-upon pricing and production limitations.

17        96.     The Crystal Meetings were also supplemented by additional bilateral discussions between

18   various defendants in which they exchanged information about pricing, shipments, and production.  As

19   is more fully alleged below, defendants had bilateral discussions with one another during price

20   negotiations with customers in order to avoid cutting prices and to implement the fixed prices set by

21   defendants during the Crystal Meetings.  These discussions usually took place between sales and

22   marketing employees in the form of telephone calls, emails and instant messages.  The information

23   gained in these communications was then shared with supervisors and taken into account in determining

24   the price to be offered defendants' customers.

25           **3.**      **Defendants' Participation in Group and Bilateral Discussions**

26        97.     Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display and Samsung

27   attended multiple CEO, Commercial and working-level meetings, as well as bilateral discussions, during

28   the Conspiracy Period and at least between 2001 and 2006.  Additionally, Quanta Display and Unipac,

1    which merged with AU Optronics, participated in working-level meetings. At the CEO and Commercial

2    meetings, these defendants agreed on prices, price increases, and production limits and quotas for LCD

3    Panels.

4           98.    Defendant LG Display has admitted and pleaded guilty to participating in the conspiracy

5    from September 2001 through June 2006 to fix the price of LCD Panels sold worldwide, including the

6    United States and California in particular, and to participating in meetings, conversations and

7    communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels,

8    agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose

9    of monitoring and enforcing adherence to the agreed-upon prices. LG Display also admitted that acts in

10   furtherance of the conspiracy to fix the price of LCD Panels were carried out in California. In

11   connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, reported at the time

12   as the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in

13   the conspiracy.

14          99.    Chung Suk "C.S." Chung, an executive from LG Display also pleaded guilty to

15   participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United

16   States and California in particular, from September 2001 through June 2006. Specifically, Mr. Chung

17   admitted that he participated in meetings, conversations and communications in Taiwan, South Korea

18   and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at

19   certain predetermined levels, issued price quotations in accordance with the agreements reached,

20   exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the

21   agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate

22   employees in the conspiracy. In connection with his guilty plea, Mr. Chung has agreed to serve a 7-

23   month prison term and pay a criminal fine of $25,000.

24          100.   Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the

25   conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in

26   particular, from September 2001 through June 2006. Specifically, Mr. Kwon admitted that he

27   participated in meetings, conversations and communications in Taiwan, South Korea and the United

28   States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain

1   predetermined levels, issued price quotations in accordance with the agreements reached, exchanged

2   pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon

3   prices, and authorized, ordered, and consented to the participation of subordinate employees in the

4   conspiracy.  In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term

5   and pay a criminal fine of $30,000.

6          101.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from

7   LG Display, has been indicted for participating in the conspiracy to fix the price of LCD Panels sold

8   worldwide, including the United States and California in particular, from December 2001 through

9   December 2005.  Specifically, Mr. Koo has been charged with participating in meetings, conversations

10   and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels,

11   including the Crystal Meetings that took place in Taiwan.  Mr. Koo has also been charged with agreeing

12   to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance

13   with the agreements reached, exchanging pricing and sales information for the purpose of monitoring

14   and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the

15   participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD

16   Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to

17   conceal the conspiracy and his conspiratorial contacts.

18          102.    Defendant Chunghwa has admitted and pleaded guilty to participating in the conspiracy

19   from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the

20   United States and California in particular, and to participating in meetings, conversations and

21   communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD

22   Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing

23   adherence to agreed-upon prices.  Chunghwa also admitted that acts in furtherance of the conspiracy to

24   fix the price of LCD Panels were carried out in California.  In connection with its guilty plea, Chunghwa

25   has agreed to pay a criminal fine of $65 million.

26          103.    Two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung

27   "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin also pleaded guilty to

28   participating in the conspiracy from September 2001 through December 2006.  Specifically, Mr. Liu,

1    Mr. Lee and Mr. Lin admitted that they participated in meetings, conversations and communications in

2    Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices

3    of LCD Panels at certain predetermined levels, issued price quotations in accordance with the

4    agreements reached, exchanged pricing and sales information for the purpose of monitoring and

5    enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the

6    participation of subordinate employees in the conspiracy.  In connection with their guilty plea, Mr. Lin

7    has agreed to serve a 9-month prison term and pay a criminal fine of $50,000; Mr. Liu has agreed to

8    serve a 7-month prison term and pay a criminal fine of $30,000; and Mr. Lee has agreed to serve a 6-

9    month prison term and pay a criminal fine of $20,000.

10         104.    In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng,

11   have been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide

12   from December 2001 through December 2005.  Specifically, Mr. Lin and Mr. Cheng have been charged

13   with participating in meetings, conversations and communications in Taiwan, South Korea and the

14   United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in

15   Taiwan.  Mr. Lin and Mr. Cheng have also been charged with agreeing to fix the prices of LCD Panels

16   at certain predetermined levels, issuing price quotations in accordance with the agreements reached,

17   exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the

18   agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees

19   in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive

20   prices to customers in the United States, and taking steps to conceal the conspiracy and their

21   conspiratorial contacts.

22         105.    Defendant Epson Japan has admitted and pleaded guilty to participating in the

23   conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Motorola and

24   agreed to pay a criminal fine of $26 million.  Epson Japan has admitted to participating in the

25   conspiracy from 2005 through 2006 to fix the prices of LCD Panels, and to participating in

26   meetings, conversations and communications in Japan and the United States to discuss the prices

27   of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales

28   information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

1   During the Conspiracy Period, Motorola was one of AT&T Mobility's largest suppliers of

2   mobile wireless handsets.

3       106.    Defendant Epson America is a wholly-owned and controlled subsidiary of co-

4   conspirator Epson Japan.  At one of the bilateral meetings described above, Epson Japan was

5   represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui").  At that meeting, Mitsui served as

6   an agent of, and under the direction of, both Epson Japan and Epson America.  Epson Japan and

7   Epson America, through their agent, were parties to the agreements made at those meetings and

8   acted as co-conspirators.  In addition, to the extent Epson America sold or distributed LCD

9   Products, it played a significant role in the conspiracy because defendants wished to ensure that

10  the prices for such products did not undercut the pricing agreements reached at these various

11  meetings.  Thus, Epson America was an active, knowing participant in the alleged conspiracy.

12      107.    Defendant Sharp has admitted and pleaded guilty to participating in the conspiracy with

13  unnamed conspirators to fix the price of LCD Panels sold to Dell from April 2001 to December 2006, to

14  Apple Computer from September 2005 to December 2006, and to Motorola from the fall of 2005 to the

15  middle of 2006, and to participating in bilateral meetings, conversations and communications in Japan

16  and in the United States with unnamed co-conspirators to discuss the prices of LCD Panels, agreeing to

17  fix the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales

18  information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  Sharp

19  admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in

20  California.  AT&T Mobility purchased handsets from Motorola that contained LCD Panels for which

21  Sharp admittedly fixed the prices.

22      108.    Defendant Sharp participated in multiple Working Level meetings, as well as bilateral

23  discussions with other defendants, during which it discussed and reached agreements with other

24  defendants on prices for LCD Panels during the Conspiracy Period.

25      109.    Defendant Sharp also participated in multiple bilateral discussions with other defendants,

26  including Toshiba and Epson, during the Conspiracy Period.  Through these discussions, Sharp agreed

27  on prices, price increases, production quotas and production limits for LCD Panels.  Because Toshiba

28  and Epson were Sharp's primary competitors in the sale of LCD Panels used in mobile wireless

1   handsets, Sharp knew that it could not have fixed the prices of LCD Panels incorporated into such

2   handsets – as Sharp admitted it did in its guilty plea – unless it reached agreements with Toshiba and

3   Epson to do the same.

4       110.    Defendant Toshiba also participated in the conspiracy by entering into joint

5   ventures and other arrangements to manufacture or source LCD Panels with one or more

6   defendant that attended the Crystal Meetings. The purpose and effect of these joint ventures by

7   Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at

8   unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-

9   fixing and production-limitation agreements reached at the meetings. During the Conspiracy

10  Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers that

11  allowed it to easily communicate and coordinate prices and production levels with other

12  manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed

13  HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba and Matsushita

14  formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In

15  April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, f/k/a

16  Toshiba Matsushita Display Technology Co. Ltd., which combined the two companies' LCD

17  development, manufacturing, and sales operations. In 2006, Toshiba purchased a 20% stake in

18  LG Display's LCD Panel manufacturing facility in Poland. The operation and management of

19  these many different joint ventures afforded Toshiba and the other defendant joint-venture

20  partners regular opportunities to communicate with each other to agree on prices, price increases

21  and production limits and quotas for LCD Panels that each defendant manufactured and sold.

22      111.    Co-conspirator Hydis Technologies Co. Ltd., f/k/a BOE Hydis Technology Co., Ltd.

23  ("Hydis"), participated in multiple lower level meetings between at least 2002 and 2005. In addition,

24  Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005. Through these

25  discussions, Hydis agreed on prices and supply levels for LCD Panels.

26      112.    Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in multiple

27  lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU

28  Optronics). Through these meetings, Mitsubishi agreed on prices and supply levels for LCD Panels.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

113.    Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001.  Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion.  Mitsui and Epson Japan agreed on prices and supply levels for LCD Panels.

114.    Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings or discussions during the Class Period with at least one other defendant or co-conspirator, which included discussions about prices for LCD Panels.

115.    Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"), and one or more of the partners in this joint venture participated in the meetings described above.  As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at these meetings.  As explained above, the agreements at these meetings included agreements on price ranges and output restrictions.  The joint venture partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels the joint ventures sold both to the joint venture partners and other non-affiliated companies.  Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

116.    When AT&T Mobility and AT&T refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that they are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate families distributed LCD Panels or LCD Products to direct purchasers, these subsidiaries played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing

agreements reached at these various meetings.  Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

### B.   Market Conditions Demonstrating the Conspiracy

117.   Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion.  Rather, the behavior of this market strongly evidences that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of stabilizing and raising prices for LCD Panels at supra-competitive levels.

118.   After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends.  However, since at least 1996, the LCD Panel market has been characterized by price stability and certain periods of substantial upward pricing trends.

119.   Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market.  In a competitive market, price increases normally occur during shortage periods.  Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

120.   The demand for consumer electronic products and their component parts generally increases over time.  As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period.  For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

121.   Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity.  Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD Panels.

122.   In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts.  Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs.  However, LCD Panel prices began rising in 1996, allegedly due to insufficient

production capacity.  In fact, defendants had begun stabilizing and raising the prices.

123.   LCD Panel prices began to increase in early 1996.  Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . .  Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

124.   Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

125.   1996 also brought the advent of third generation fabs.  Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs.  LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998.  Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops.  Ever-increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly.  Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards.  These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

126.   The supra-competitive level of LCD Panel prices during the Conspiracy Period is demonstrated by, *inter alia*, the fact that costs were decreasing.  One of the most significant costs in producing an LCD Panel is the cost of its component parts.  Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass.  During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate.  Thus, the margin between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

127.   During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased.  Similarly, during the end of 2003 to 2004,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased. This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

128.   LCD Panel prices increased by more than 5% in October 2001. These price increases continued until June of 2002.

129.   At the time, defendants blamed these price increases on supply shortages. In fact, these price increases were a direct result of defendants' agreement to fix, maintain, and/or stabilize the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement. When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

130.   These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency. These decreasing costs should have led to lower prices and competition among defendants. Instead, because defendants had entered into an agreement to fix, raise, and maintain the prices for LCD Panels at artificially high levels, it resulted in extremely high profits. For example, defendants AU Optronics Inc., Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc. posted higher pretax profits than expected in the first quarter of 2002. AU Optronics reported revenue of NT$ 19.7 billion in the first quarter, with pretax profit reaching about NT$2 billion. Chi Mei Optoelectronics reported pretax earnings of NT$800 million on revenue of about NT$8.8 billion at the same period.

131.   This increase in prices and revenue was unprecedented. During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc. (later purchased by AU Optronics) rose 184% from the same period in 2001.

## VII.   GOVERNMENT INVESTIGATIONS OF PRICE-FIXING

132.   In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers. In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed for the first time that officials from the South Korea Fair

Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

133.    On December 12, 2006, news reports indicated that in addition to LG Display, defendants Samsung, Sharp and AU Optronics were also under investigation.

134.    The DOJ acknowledged that it was "investigating the possibility of anticompetitive practices and is cooperating with foreign authorities."

135.    At least one defendant has approached the DOJ to enter into a leniency agreement with respect to defendants' conspiracy to fix prices of LCD Panels.  In order to enter into a leniency agreement under the Corporate Leniency Policy of the Department of Justice, this defendant has reported defendants' price-fixing conspiracy to the DOJ and has confessed its own participation in defendants' price-fixing conspiracy.

136.    On or about November 12, 2008, defendants LG Display, Sharp and Chunghwa agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix prices in the sale of LCD Panels.  On or about January 15, 2009, three current and former executives from Chunghwa:  Chieng-Hon "Frank" Lin, Chih-Chun "C.C." Liu, and Hsueh-Lung "Brian" Lee, agreed to plead guilty to participating in the conspiracy from September 2001 to December 2006.  Mr. Lin agreed to serve a 9-month prison sentence and pay a $50,000 criminal fine; Mr. Liu agreed to serve a 7-month prison sentence and pay a $30,000 criminal fine; and Mr. Lee agreed to serve a 6-month prison sentence and pay a $20,000 criminal fine.  Also on or about January 15, 2009, Chang Suk "C.S." Chung, an executive from LG Display, agreed to plead guilty to participating in the conspiracy from September 2001 to June 2006.  Mr. Chung agreed to serve a 7-month prison sentence and pay a $25,000 criminal fine.  On or about February 3, 2009, former LG executive Duk Mo Koo, and two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng were indicted for participating in the global LCD price fixing conspiracy.  On or about April 27, 2009, a high level executive of LG Display, Bock Kwon, agreed to plead guilty to global LCD price fixing.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    137.   The DOJ's investigation of the remaining defendants is ongoing and is expected to result

2    in additional guilty pleas and criminal fines from the other defendants to this action.

3    **VIII.   PLAINTIFFS' INJURIES**

4    138.   AT&T Mobility has suffered a direct, substantial, and reasonably foreseeable injury as

5    both a purchaser of mobile wireless handsets containing LCD Panels and as a purchaser of other LCD

6    Products as a result of defendants' conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels

7    at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of LCD Panels

8    incorporated into such mobile wireless handsets, causing AT&T Mobility to pay higher prices than it

9    would have in the absence of defendants' conspiracy.

10   139.   In some cases, AT&T Mobility purchased mobile wireless handsets directly from

11   defendants.  For example, during the Conspiracy Period, AT&T Mobility purchased mobile wireless

12   handsets directly from defendant Samsung and/or its wholly owned and controlled sales agents.  As a

13   result of defendants' conspiracy to fix the price of LCD panels, AT&T Mobility purchased mobile

14   "Samsung"-branded wireless handsets from Samsung at artificially-inflated prices and suffered injury as

15   a direct purchaser from Samsung.

16   140.   During the Conspiracy Period, AT&T Mobility also purchased mobile wireless handsets

17   directly from LG Electronics, Inc. and its subsidiaries, affiliates or sales agents (collectively, "LG

18   Electronics").  LG Electronics owned a substantial interest in and exerted control over defendant LG

19   Display, which has already pleaded guilty to having fixed the price of LCD Panels.  Defendants'

20   conspiracy to fix the price of LCD Panels affected the LCD Panels contained in the mobile wireless

21   handsets AT&T Mobility purchased from LG Electronics.  LG Electronics passed on the overcharge

22   caused by defendants' conspiracy to AT&T Mobility, and as a result, AT&T Mobility suffered injury

23   and paid supra-competitive prices for "LG"-branded mobile wireless handsets it purchased from LG

24   Electronics.

25   141.   AT&T Mobility suffered injury as a direct purchaser as a result of its purchases of mobile

26   wireless handsets from LG Electronics.  During the Conspiracy Period, LG Display was the

27   manufacturing agent and alter ego of LG Electronics, and LG Electronics and LG Display constituted a

28   single entity for purposes of AT&T Mobility's purchases from LG Electronics due to their close

affiliation and unity of interest. Beginning in July 1999, LG Electronics placed its LCD Panel manufacturing operations in LG Display, which LG Electronics organized as a joint venture and which also received a capital contribution from Royal Philips Electronics N.V. In June 1999, LG Display began manufacturing LCD Panels at the same fabs in Gumi, South Korea previously owned and operated in the name of LG Electronics. From 1999 through 2006 LG Electronics exerted control over all aspects of LG Display's operations. Boon Joon Koo, CEO of LG Display, was formerly vice president of LG Electronics. Hee Gook Lee, president of LG Electronics, served on the board of LG Display.

142. In addition, due to its financial interest in and control over LG Display, LG Electronics stood to reap substantial financial benefits from LG Display's participation in the conspiracy to fix the price of LCD Panels. Because LG Electronics profited from the artificially-inflated prices for LCD Panels charged by LG Display, there is no realistic possibility that LG Electronics will attempt to recover any overcharges for LCD Panels that LG Electronics purchased from LG Display or any of LG Display's co-conspirators.

143. AT&T Mobility also purchased mobile wireless handsets containing LCD Panels from other handset OEMs, which in turn purchased LCD Panels from defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of LCD Panels purchased by these handset OEMs, which paid higher prices for LCD Panels than they would have absent the conspiracy. The conspiracy artificially inflated the prices of TFT-LCD Panels included in mobile wireless handsets, as well the price of MSTN and CSTN LCD Panels included in such handsets.

144. The handset OEMs passed on to their customers, including AT&T Mobility, the overcharges caused by defendants' conspiracy. AT&T Mobility was not able to pass on to its customers the overcharge caused by defendants' conspiracy. Thus, AT&T Mobility suffered injury when it purchased mobile wireless handsets containing LCD Panels from the handset OEMs.

145. In addition, AT&T Mobility and AT&T have suffered a direct, substantial, and reasonably foreseeable injury as a result of defendants' conspiracy to raise, fix, stabilize or maintain the price of LCD Panels at artificial levels as purchasers of LCD Products for their own use.

146. During the Conspiracy Period, a number of large computer OEMs, such as Dell, IBM,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   and Hewlett-Packard, sold desktop computer monitors and laptop and notebook computers to AT&T

2   Mobility and AT&T.  In fact, the computer OEM with the largest share of desktop computer monitor

3   and laptop and notebook computer sales in the United States, Dell, sold exclusively to end users,

4   including AT&T Mobility and AT&T.

5          147.    Defendants' conspiracy artificially inflated the price of the LCD Panels purchased by

6   these computer OEMs for incorporation into the desktop computer monitors and laptop and notebook

7   computers sold to AT&T Mobility and AT&T.  The computer OEMs passed on these artificially-inflated

8   prices for LCD Panels to AT&T Mobility and AT&T, causing AT&T Mobility and AT&T to pay higher

9   prices for the desktop computer monitors and laptop and notebook computers than they would have paid

10  in the absence of the defendants' conspiracy.

11         148.    Once an LCD Panel leaves its place of manufacture, it remains essentially unchanged as

12  it moves through the distribution system.  LCD Panels are identifiable, discreet physical objects that do

13  not change form or become an indistinguishable part of an LCD Product.  Thus, LCD Panels follow a

14  physical chain from defendants through manufacturers of LCD Products sold to AT&T Mobility and to

15  AT&T.

16         149.    The market for LCD Panels and the market for LCD Products are inextricably linked and

17  cannot be considered separately.  Defendants are well aware of this intimate relationship.

18         150.    The LCD Product OEMs' demand for LCD Panels was relatively inelastic, because there

19  were no reasonable substitutes for LCD Panels to serve as the visual display for products such as mobile

20  wireless handsets, desktop computer monitors and laptop and notebook computers.  The other principal

21  flat panel display technology, plasma, is too big, consumes too much power and is too fragile to be of

22  any practical application in mobile wireless handsets or laptop or notebook computers.  Other competing

23  display technologies, such as OLED displays, were not available during the Conspiracy Period and are

24  only today becoming widely available.  In addition, throughout the Conspiracy Period, defendants

25  controlled the market for LCD Panels.  Consequently, during the Conspiracy Period, the handset OEMs

26  and computer OEMs had no choice but to purchase LCD Panels from defendants and others at prices

27  that were artificially inflated, fixed, and stabilized by defendants' conspiracy.

28         151.    As a result, AT&T Mobility and AT&T were injured in connection with their purchases

36

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

of LCD Products for internal use during the Conspiracy Period.

**IX.     FRAUDULENT CONCEALMENT**

152.     AT&T Mobility and AT&T did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December of 2006, when the existence of investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy.  Because defendants' agreement, understanding and conspiracy were kept secret, AT&T Mobility and AT&T were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for LCD Products.

153.     The affirmative acts of defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

154.     By its very nature, defendants' price-fixing conspiracy was inherently self-concealing. As alleged above, defendants had secret discussions about price and output.  Defendants agreed not to publicly discuss the existence or the nature of their agreement.  In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.  Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to the one-on-one so-called "Round Robin" sessions.

155.     In addition, defendants repeatedly gave pretextual justifications for the inflated prices of LCD Panels in furtherance of the conspiracy.

156.     There have been a variety of other purportedly market-based explanations for price increases.  The first was supply and demand.  In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."  Bock Kwon, Vice President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

157.     Another false rationale provided by defendants was undercapitalization.  In 1999, Joel Pollack, a marketing manager for Sharp, stated:

Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry.

158.    A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung. He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

159.    Increased demand was repeatedly cited by defendants throughout the Conspiracy Period. On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up." Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Koo Duk-Mo of LG Philips stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

160.    Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

161.    These explanations were all pretextual and each served to cover up the conspiracy. As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to AT&T Mobility's and AT&T's claims.

## X.    VIOLATIONS ALLEGED

### First Claim for Relief
### (Violation of Sherman Act Against All Defendants)

162.    AT&T Mobility and AT&T incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

163.    Beginning at a time presently unknown to AT&T Mobility and AT&T, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to AT&T Mobility and AT&T, defendants and their co-conspirators entered into a continuing

38

agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

164.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

    a.    To fix, raise, maintain and stabilize the price of LCD Panels;

    b.    To allocate markets for LCD Panels among themselves;

    c.    To submit rigged bids for the award and performance of certain LCD Panels contracts; and

    d.    To allocate among themselves the production of LCD Panels.

165.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.    Price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in the United States;

    b.    Prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

    c.    Those who purchased LCD Panels produced by defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

166.    AT&T Mobility has been injured in its business and property by being forced to pay more for the mobile wireless handsets it purchased from defendants and their co-conspirators than it would have paid in the absence of defendants' conspiracy.

167.    Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by AT&T Mobility and gave rise to AT&T Mobility's antitrust claims.  As a result, AT&T Mobility suffered injury as a direct, proximate, and reasonably

1  foreseeable result of defendants' conspiracy to fix the price of LCD Panels and are entitled to damages

2  under Section 4 of the Clayton Act, 15 U.S.C. § 15, for their purchases of LCD Products containing

3  LCD Panels sold by defendants, their coconspirators, and others.

4        168.   Because defendants all continue to manufacture LCD Panels, the market for production

5  and sale of LCD Panels remains highly concentrated and susceptible to collusion, defendants continue to

6  have the incentive to collude to increase LCD Panel prices or stabilize LCD Panel price declines,

7  defendants' conspiracy to fix the price of LCD Panels could be easily repeated and concealed from

8  AT&T Mobility and AT&T, AT&T Mobility and AT&T both face a serious risk of future injury, and

9  are thus entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26 against all

10  defendants, preventing and restraining the violations alleged herein.

11  
12  **Second Claim for Relief**<br>**(Violation of the California Cartwright Act)**

13        169.   AT&T Mobility and AT&T incorporate and reallege, as though fully set forth herein,

14  each and every allegation set forth in the preceding paragraphs of this Complaint.

15        170.   During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial

16  volume of business in California.  AT&T Mobility provided wireless communication services and sold

17  mobile wireless handsets containing LCD Panels to customers in California through its corporate-owned

18  retail stores, through independent retailers located in California, and through its website on the Internet.

19  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets

20  directly to business, government and other customers in California through both its own sales force and

21  independent sales agents.  In addition, AT&T Mobility maintained in California inventories of mobile

22  wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators,

23  and others, and operated offices and operating retail stores in California.  AT&T, including Pacific Bell

24  Telephone Company, provided a variety of wireline telecommunications services to residents,

25  businesses and government customers in California, where AT&T employees used notebook computers

26  and desktop monitors purchased by AT&T.  As a result of their presence in California and the

27  substantial business they conduct in California, AT&T Mobility and AT&T are entitled to the protection

28  of the laws of California.

171.    In addition, defendants LG Display, Chunghwa and Sharp all admitted in their plea agreements that acts in furtherance of their conspiracy to fix the price of LCD Panels were carried out in California.  Defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung and Toshiba all maintained offices in California during the Conspiracy Period.  Employees at defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out defendants' anticompetitive agreement to fix the price of LCD Panels.  Defendants' conduct within California thus injured AT&T Mobility and AT&T both in California and throughout the United States.

172.    Beginning at a time presently unknown to AT&T Mobility and AT&T, but at least as early as January 1, 1996, and continuing thereafter at least up to and including at least December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, LCD Panels at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

173.    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, LCD Panels.

174.    For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.    to fix, raise, maintain and stabilize the price of LCD Panels;

      b.    to allocate markets for LCD Panels amongst themselves;

      c.    to submit rigged bids for the award and performance of certain LCD Panels contracts; and

      d.    to allocate among themselves the production of LCD Panels.

175.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.    price competition in the sale of LCD Panels has been restrained, suppressed and/or eliminated in the State of California;

b.    prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.    those who purchased LCD Panels from defendants, their co-conspirators, and others and LCD Products containing LCD Panels from defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

176.    As a result of the alleged conduct of defendants, AT&T Mobility and AT&T paid supra-competitive, artificially inflated prices for the LCD Products they purchased during the Conspiracy Period.

177.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products sold by the defendants, their coconspirators, and others than they would have paid in the absence of defendants' combination and conspiracy.  As a result of defendants' violation of Section 16720 of the California Business and Professions Code, AT&T Mobility and AT&T are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief
### (Violation of State Antitrust and Unfair Competition Laws)

178.    AT&T Mobility and AT&T incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

179.    All of AT&T Mobility's and AT&T's purchases of LCD Products are actionable pursuant to the federal and the California antitrust laws as alleged in the First and Second Claims For Relief.  In the alternative, AT&T Mobility and AT&T allege this Third Claim For Relief under the laws of the other referenced states as well as under the California Unfair Competition Law.

180.    By reason of the foregoing, defendants have entered into agreements in restraint of trade

in violation of Arizona Revised Stat. §§44-1401 *et seq.*:

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Arizona and fixed, raised, maintained and stabilized LCD Panel prices in Arizona at artificially high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected Arizona commerce;

    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Arizona. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Arizona through its corporate-owned retail stores, through independent retailers located in Arizona, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Arizona through both its own sales force and independent sales agents. In addition, AT&T Mobility maintained in Arizona inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Arizona. During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in Arizona, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Arizona and the substantial business they conduct in Arizona, AT&T Mobility and AT&T are entitled to the protection of the laws of Arizona; and,

    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

181.    By reason of the foregoing, defendants have engaged in unfair competition in violation of

1    California's Unfair Competition Law, California Business and Professional Code § 17200 et seq.

2         a.     Defendants committed acts of unfair competition, as defined by Section 17200, *et*

3                *seq.*, by engaging in a conspiracy to fix and stabilize the price of LCD Panels as

4                described above;

5         b.     The acts, omissions, misrepresentations, practices and non-disclosures of

6                defendants, as described above, constitute a common, continuous and continuing

7                course of conduct of unfair competition by means of unfair, unlawful and/or

8                fraudulent business acts or practices with the meaning of Section 17200, *et seq.*,

9                including, but not limited to (1) violation of Section 1 of the Sherman Act; (2)

10               violation of the Cartwright Act;

11        c.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures are

12               unfair, unconscionable, unlawful and/or fraudulent independently of whether they

13               constitute a violation of the Sherman Act or the Cartwright Act;

14        d.     Defendants' acts or practices are fraudulent or deceptive within the meaning of

15               Section 17200, *et seq.*;

16        e.     Defendants' conduct was carried out, effectuated, and perfected within the state of

17               California. Defendants LG Display, Chunghwa and Sharp all admitted that acts in

18               furtherance of the conspiracy to fix the price of LCD Panels were carried out in

19               California;

20        f.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a

21               substantial volume of business in California. AT&T Mobility provided wireless

22               communication services and sold mobile wireless handsets containing LCD

23               Panels to customers in California through its corporate-owned retail stores,

24               through independent retailers located in California, and through its website on the

25               Internet. AT&T Mobility also provided wireless communication services and

26               sold mobile wireless handsets directly to business, government and other

27               customers in California through both its own sales force and independent sales

28               agents. In addition, AT&T Mobility maintained in California inventories of

mobile wireless handsets containing LCD Panels manufactured and sold by
defendants, their co-conspirators, and others, and operated offices and retail stores
in California.  AT&T provided various wireline telecommunications services to
residents, businesses and government customers in California, where AT&T
employees used notebook computers and desktop monitors purchased by AT&T.
As a result of their presence in California and the substantial business they
conduct in California, AT&T Mobility and AT&T are entitled to the protection of
the laws of California; and,

  g. By reason of the foregoing, AT&T Mobility and AT&T are entitled to full
restitution and/or disgorgement of all revenues, earnings, profits, compensation,
and benefits that may have been obtained by defendants as result of such business
acts and practices described above.

182. By reason of the foregoing, defendants have entered into agreements in restraint of trade
in violation of District of Columbia Code Ann. §§28-4501 *et seq.*

  a. Defendants' conspiracy restrained, suppressed and/or eliminated competition in
the sale of LCD Panels in the District of Columbia and fixed, raised, maintained
and stabilized LCD Panel prices in the District of Columbia at artificially high,
non-competitive levels;

  b. As a result, defendants' conspiracy substantially affected District of Columbia
commerce;

  c. During the Conspiracy Period, AT&T Mobility and AT&T conducted a
substantial volume of business in the District of Columbia.  AT&T Mobility
provided wireless communication services and sold mobile wireless handsets
containing LCD Panels to customers in the District of Columbia through its
corporate-owned retail stores, through independent retailers located in the District
of Columbia, and through its website on the Internet.  AT&T Mobility also
provided wireless communication services and sold mobile wireless handsets
directly to business, government and other customers in the District of Columbia

45

1  through both its own sales force and independent sales agents. In addition, AT&T

2  Mobility maintained in the District of Columbia inventories of mobile wireless

3  handsets containing LCD Panels manufactured and sold by defendants, their co-

4  conspirators, and others, and operated offices and retail stores in the District of

5  Columbia. AT&T provided various wireline telecommunications services to

6  businesses and government customers in the District of Columbia, where AT&T

7  employees used notebook computers and desktop monitors purchased by AT&T.

8  As a result of their presence in the District of Columbia and the substantial

9  business they conduct in the District of Columbia, AT&T Mobility and AT&T are

10  entitled to the protection of the laws of the District of Columbia; and,

11  d.  As a direct and proximate result of defendants' conduct, AT&T Mobility and

12  AT&T have been injured in their business and property by paying more for LCD

13  Products purchased from defendants, their coconspirators and others than they

14  would have paid in the absence of defendants' combination and conspiracy, and

15  are entitled to relief under District of Columbia Code Ann. §§ 28-4501, *et seq.*

16  183.  By reason of the foregoing, defendants have engaged in unfair competition and/or unfair

17  or deceptive acts or practices in restraint of trade in violation of Hawaii Code, H.R.S. §§ 480-1, *et seq.*

18  a.  Defendants' conspiracy restrained, suppressed and/or eliminated competition in

19  the sale of LCD Panels in Hawaii and fixed, raised, maintained and stabilized

20  LCD Panel prices in Hawaii at artificially high, non-competitive levels;

21  b.  As a result, defendants' conspiracy substantially affected Hawaii commerce;

22  c.  During the Conspiracy Period, AT&T Mobility and AT&T conducted a

23  substantial volume of business in Hawaii. AT&T Mobility provided wireless

24  communication services and sold mobile wireless handsets containing LCD

25  Panels to customers in Hawaii through its corporate-owned retail stores, through

26  independent retailers located in Hawaii, and through its website on the Internet.

27  AT&T Mobility also provided wireless communication services and sold mobile

28  wireless handsets directly to business, government and other customers in Hawaii

through both its own sales force and independent sales agents. In addition, AT&T Mobility maintained in Hawaii inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Arizona. During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in Hawaii, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Hawaii and the substantial business they conduct in Hawaii, AT&T Mobility and AT&T are entitled to the protection of the laws of Hawaii; and,

    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

184. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Illinois and fixed, raised, maintained and stabilized LCD Panel prices in Illinois at artificially high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected Illinois commerce;

    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Illinois. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Illinois through its corporate-owned retail stores, through independent retailers located in Illinois, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Illinois

47

through both its own sales force and independent sales agents.  In addition, AT&T
Mobility maintained in Illinois inventories of mobile wireless handsets containing
LCD Panels manufactured and sold by defendants, their co-conspirators, and
others, and operated offices and retail stores in Illinois.  During the Conspiracy
Period, AT&T provided various wireline telecommunications services to
residential customers as well as businesses and government customers in Illinois,
where AT&T employees used notebook computers and desktop monitors
purchased by AT&T.  As a result of their presence in Illinois and the substantial
business they conduct in Illinois, AT&T Mobility and AT&T are entitled to the
protection of the laws of Illinois; and,

    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and
AT&T have been injured in their business and property by paying more for LCD
Products purchased from defendants, their coconspirators and others than they
would have paid in the absence of defendants' combination and conspiracy, and
are entitled to relief under the Illinois Antitrust Act.

185.    By reason of the foregoing, defendants have entered into agreements in restraint of trade
in violation of Iowa Code §§553.1 *et seq.*

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in
the sale of LCD Panels in Iowa and fixed, raised, maintained and stabilized LCD
Panel prices in Iowa at artificially high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected Iowa commerce;

    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a
substantial volume of business in Iowa.  AT&T Mobility provided wireless
communication services and sold mobile wireless handsets containing LCD
Panels to customers in Iowa through its corporate-owned retail stores, through
independent retailers located in Iowa, and through its website on the Internet.
AT&T Mobility also provided wireless communication services and sold mobile
wireless handsets directly to business, government and other customers in Iowa

48

1         through both its own sales force and independent sales agents.  In addition, AT&T

2         Mobility maintained in Iowa inventories of mobile wireless handsets containing

3         LCD Panels manufactured and sold by defendants, their co-conspirators, and

4         others, and operated offices and retail stores in Iowa.  During the Conspiracy

5         Period, AT&T provided various wireline telecommunications services to

6         businesses and government customers in Iowa, where AT&T employees used

7         notebook computers and desktop monitors purchased by AT&T.  As a result of

8         their presence in Arizona and the substantial business they conduct in Iowa,

9         AT&T Mobility and AT&T are entitled to the protection of the laws of Iowa;

10    d.      As a direct and proximate result of defendants' conduct, AT&T Mobility and

11         AT&T have been injured in their business and property by paying more for LCD

12         Products purchased from defendants, their coconspirators and others than they

13         would have paid in the absence of defendants' combination and conspiracy, and

14         are entitled to relief under Iowa Code §§ 553.1 *et seq.*

15      186.    By reason of the foregoing, defendants have entered into agreements in restraint of trade

16 in violation of Kansas Stat. Ann. §§50-101 *et seq.*

17    a.      Defendants' conspiracy restrained, suppressed and/or eliminated competition in

18         the sale of LCD Panels in Kansas and fixed, raised, maintained and stabilized

19         LCD Panel prices in Kansas at artificially high, non-competitive levels;

20    b.      As a result, defendants' conspiracy substantially affected Kansas commerce;

21    c.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

22         substantial volume of business in Kansas.  AT&T Mobility provided wireless

23         communication services and sold mobile wireless handsets containing LCD

24         Panels to customers in Kansas through its corporate-owned retail stores, through

25         independent retailers located in Kansas, and through its website on the Internet.

26         AT&T Mobility also provided wireless communication services and sold mobile

27         wireless handsets directly to business, government and other customers in Kansas

28         through both its own sales force and independent sales agents.  In addition, AT&T

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Mobility maintained in Kansas inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Kansas. During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers as well as businesses and government customers in Kansas, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Kansas and the substantial business they conduct in Kansas, AT&T Mobility and AT&T are entitled to the protection of the laws of Kansas; and,

    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Kansas Stat. Ann. §§50-101 *et seq.*

187. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Maine and fixed, raised, maintained and stabilized LCD Panel prices in Maine at artificially high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected Maine commerce;

    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Maine. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Maine through its corporate-owned retail stores, through independent retailers located in Maine, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Maine through both its own sales force and independent sales agents. In addition, AT&T

Mobility maintained in Maine inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Maine. During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in Maine, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Maine and the substantial business they conduct in Maine, AT&T Mobility and AT&T are entitled to the protection of the laws of Maine; and,

d. As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

188. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771 *et seq.*

a. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Michigan and fixed, raised, maintained and stabilized LCD Panel prices in Michigan at artificially high, non-competitive levels;

b. As a result, defendants' conspiracy substantially affected Michigan commerce;

c. During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Michigan. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Michigan through its corporate-owned retail stores, through independent retailers located in Michigan, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Michigan through both its own sales force and independent sales

51

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

agents.  In addition, AT&T Mobility maintained in Michigan inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Michigan.  During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses and government customers in Michigan, where AT&T employees used notebook computers and desktop monitors purchased by AT&T.  As a result of their presence in Michigan and the substantial business they conduct in Michigan, AT&T Mobility and AT&T are entitled to the protection of the laws of Michigan; and,

d. As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771 *et seq.*

189.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.50 *et seq.*

a. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Minnesota and fixed, raised, maintained and stabilized LCD Panel prices in Minnesota at artificially high, non-competitive levels;

b. As a result, defendants' conspiracy substantially affected Minnesota commerce;

c. During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Minnesota.  AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Minnesota through its corporate-owned retail stores, through independent retailers located in Minnesota, and through its website on the Internet.  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Minnesota through both its own sales force and independent sales

52

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

agents.  In addition, AT&T Mobility maintained in Minnesota inventories of
mobile wireless handsets containing LCD Panels manufactured and sold by
defendants, their co-conspirators, and others, and operated offices and retail stores
in Minnesota.  During the Conspiracy Period, AT&T provided various wireline
telecommunications services to businesses and government customers in
Minnesota, where AT&T employees used notebook computers and desktop
monitors purchased by AT&T.  As a result of their presence in Minnesota and the
substantial business they conduct in Minnesota, AT&T Mobility and AT&T are
entitled to the protection of the laws of Minnesota; and,

    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and
AT&T have been injured in their business and property by paying more for LCD
Products purchased from defendants, their coconspirators and others than they
would have paid in the absence of defendants' combination and conspiracy, and
are entitled to relief under Minnesota Stat. §§ 325D.50 *et seq.*

190.    By reason of the foregoing, defendants have entered into agreements in restraint of trade
in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.*

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in
the sale of LCD Panels in Mississippi and fixed, raised, maintained and stabilized
LCD Panel prices in Mississippi at artificially high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected Mississippi commerce;

    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a
substantial volume of business in Mississippi.  AT&T Mobility provided wireless
communication services and sold mobile wireless handsets containing LCD
Panels to customers in Mississippi through its corporate-owned retail stores,
through independent retailers located in Mississippi, and through its website on
the Internet.  AT&T Mobility also provided wireless communication services and
sold mobile wireless handsets directly to business, government and other
customers in Mississippi through both its own sales force and independent sales

agents.  In addition, AT&T Mobility maintained in Mississippi inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Mississippi.  During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses and government customers in Mississippi, where AT&T employees used notebook computers and desktop monitors purchased by AT&T.  As a result of their presence in Mississippi and the substantial business they conduct in Mississippi, AT&T Mobility and AT&T are entitled to the protection of the laws of Mississippi; and,

    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Mississippi Code Ann. §§ 75-21-1 *et seq.*

191.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Nebraska and fixed, raised, maintained and stabilized LCD Panel prices in Nebraska at artificially high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected Nebraska commerce;

    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Nebraska.  AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Nebraska through its corporate-owned retail stores, through independent retailers located in Nebraska, and through its website on the Internet.  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Nebraska through both its own sales force and independent sales

54

1    agents.  In addition, AT&T Mobility maintained in Nebraska inventories of

2    mobile wireless handsets containing LCD Panels manufactured and sold by

3    defendants, their co-conspirators, and others, and operated offices and retail stores

4    in Nebraska.  During the Conspiracy Period, AT&T provided various wireline

5    telecommunications services to businesses and government customers in

6    Nebraska, where AT&T employees used notebook computers and desktop

7    monitors purchased by AT&T.  As a result of their presence in Nebraska and the

8    substantial business they conduct in Nebraska, AT&T Mobility and AT&T are

9    entitled to the protection of the laws of Nebraska; and,

10          d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and

11                AT&T have been injured in their business and property by paying more for LCD

12                Products purchased from defendants, their coconspirators and others than they

13                would have paid in the absence of defendants' combination and conspiracy, and

14                are entitled to relief under Nebraska Stat. §§ 59-801 *et seq.*

15    192.    By reason of the foregoing, defendants have entered into agreements in restraint of trade

16    in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

17          a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in

18                the sale of LCD Panels in Nevada and fixed, raised, maintained and stabilized

19                LCD Panel prices in Nevada at artificially high, non-competitive levels;

20          b.    As a result, defendants' conspiracy substantially affected Nevada commerce;

21          c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

22                substantial volume of business in Nevada.  AT&T Mobility provided wireless

23                communication services and sold mobile wireless handsets containing LCD

24                Panels to customers in Nevada through its corporate-owned retail stores, through

25                independent retailers located in Nevada, and through its website on the Internet.

26                AT&T Mobility also provided wireless communication services and sold mobile

27                wireless handsets directly to business, government and other customers in Nevada

28                through both its own sales force and independent sales agents.  In addition, AT&T

1   Mobility maintained in Nevada inventories of mobile wireless handsets

2   containing LCD Panels manufactured and sold by defendants, their co-

3   conspirators, and others, and operated offices and retail stores in Nevada.  During

4   the Conspiracy Period, AT&T provided various wireline telecommunications

5   services to residential customers, businesses and government customers in

6   Nevada, where AT&T employees used notebook computers and desktop monitors

7   purchased by AT&T.  Nevada Bell, a wholly-owned subsidiary of the AT&T

8   companies, provided a variety of telecommunications services to a substantial

9   portion of the population of Nevada.  As a result of their presence in Nevada and

10  the substantial business they conduct in Nevada, AT&T Mobility and AT&T are

11  entitled to the protection of the laws of Nevada; and,

12  d.  As a direct and proximate result of defendants' conduct, AT&T Mobility and

13  AT&T have been injured in their business and property by paying more for LCD

14  Products purchased from defendants, their coconspirators and others than they

15  would have paid in the absence of defendants' combination and conspiracy, and

16  are entitled to relief under Nevada Rev. Stat. Ann. §§ 598A *et seq.*

17  193.   By reason of the foregoing, defendants have entered into agreements in restraint of trade

18  in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

19  a.  Defendants' conspiracy restrained, suppressed and/or eliminated competition in

20  the sale of LCD Panels in New Mexico and fixed, raised, maintained and

21  stabilized LCD Panel prices in New Mexico at artificially high, non-competitive

22  levels;

23  b.  As a result, defendants' conspiracy substantially affected New Mexico commerce;

24  c.  During the Conspiracy Period, AT&T Mobility and AT&T conducted a

25  substantial volume of business in New Mexico.  AT&T Mobility provided

26  wireless communication services and sold mobile wireless handsets containing

27  LCD Panels to customers in New Mexico through its corporate-owned retail

28  stores, through independent retailers located in New Mexico, and through its

website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in New Mexico through both its own sales force and independent sales agents. In addition, AT&T Mobility maintained in New Mexico inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in New Mexico. During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in New Mexico, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in New Mexico and the substantial business they conduct in New Mexico, AT&T Mobility and AT&T are entitled to the protection of the laws of New Mexico; and,

  d. As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

194. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New York General Business Law §§ 340 *et seq.*

  a. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in New York and fixed, raised, maintained and stabilized LCD Panel prices in New York at artificially high, non-competitive levels;

  b. As a result, defendants' conspiracy substantially affected New York commerce;

  c. During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in New York. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in New York through its corporate-owned retail stores, through independent retailers located in New York, and through its website on the

1       Internet.  AT&T New York also provided wireless communication services and

2       sold mobile wireless handsets directly to business, government and other

3       customers in New York through both its own sales force and independent sales

4       agents.  In addition, AT&T Mobility maintained in New York inventories of

5       mobile wireless handsets containing LCD Panels manufactured and sold by

6       defendants, their co-conspirators, and others, and operated offices and retail stores

7       in New York.  During the Conspiracy Period, AT&T provided various wireline

8       telecommunications services to businesses and government customers in New

9       York, where AT&T employees used notebook computers and desktop monitors

10      purchased by AT&T.  AT  As a result of their presence in New York and the

11      substantial business they conduct in New York, AT&T Mobility and AT&T are

12      entitled to the protection of the laws of New York; and,

13   d.   As a direct and proximate result of defendants' conduct, AT&T Mobility and

14      AT&T have been injured in their business and property by paying more for LCD

15      Products purchased from defendants, their coconspirators and others than they

16      would have paid in the absence of defendants' combination and conspiracy, and

17      are entitled to relief under New York General Business Law §§ 340 *et seq.*

18   195.   By reason of the foregoing, defendants have entered into agreements in restraint of trade

19   in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.*

20   a.   Defendants' conspiracy restrained, suppressed and/or eliminated competition in

21      the sale of LCD Panels in North Carolina and fixed, raised, maintained and

22      stabilized LCD Panel prices in North Carolina at artificially high, non-competitive

23      levels;

24   b.   As a result, defendants' conspiracy substantially affected North Carolina

25      commerce;

26   c.   During the Conspiracy Period, AT&T Mobility and AT&T conducted a

27      substantial volume of business in North Carolina.  AT&T Mobility provided

28      wireless communication services and sold mobile wireless handsets containing

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   LCD Panels to customers in North Carolina through its corporate-owned retail

2   stores, through independent retailers located in North Carolina, and through its

3   website on the Internet.  AT&T Mobility also provided wireless communication

4   services and sold mobile wireless handsets directly to business, government and

5   other customers in North Carolina through both its own sales force and

6   independent sales agents.  In addition, AT&T Mobility maintained in North

7   Carolina inventories of mobile wireless handsets containing LCD Panels

8   manufactured and sold by defendants, their co-conspirators, and others, and

9   operated offices and retail stores in North Carolina.  During the Conspiracy

10  Period, AT&T provided various wireline telecommunications services to

11  residential customers, businesses and government customers in North Carolina,

12  where AT&T employees used notebook computers and desktop monitors

13  purchased by AT&T.  As a result of their presence in North Carolina and the

14  substantial business they conduct in North Carolina, AT&T Mobility and AT&T

15  are entitled to the protection of the laws of North Carolina; and,

16  d.   As a direct and proximate result of defendants' conduct, AT&T Mobility and

17  AT&T have been injured in their business and property by paying more for LCD

18  Products purchased from defendants, their coconspirators and others than they

19  would have paid in the absence of defendants' combination and conspiracy, and

20  are entitled to relief under North Carolina Gen. Stat. §§ 75-1 *et seq.*

21  196.   By reason of the foregoing, defendants have entered into agreements in restraint of trade

22  in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

23  a.   Defendants' conspiracy restrained, suppressed and/or eliminated competition in

24  the sale of LCD Panels in North Dakota and fixed, raised, maintained and

25  stabilized LCD Panel prices in North Dakota at artificially high, non-competitive

26  levels;

27  b.   As a result, defendants' conspiracy substantially affected North Dakota

28  commerce;

c. During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in North Dakota. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in North Dakota through its corporate-owned retail stores, through independent retailers located in North Dakota, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in North Dakota through both its own sales force and independent sales agents. In addition, AT&T Mobility maintained in North Dakota inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in North Dakota. During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in North Dakota, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in North Dakota and the substantial business they conduct in North Dakota, AT&T Mobility and AT&T are entitled to the protection of the laws of North Dakota; and,

d. As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

197. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the Puerto Rico Code 10 LPRA §§ 257, *et seq.* and 31 LPRA § 5141.

a. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Puerto Rico and fixed, raised, maintained and stabilized LCD Panel prices in Puerto Rico at artificially high, non-competitive levels;

b. As a result, defendants' conspiracy substantially affected Puerto Rico commerce;

60

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

c.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

substantial volume of business in Puerto Rico.  AT&T Mobility provided wireless

communication services and sold mobile wireless handsets containing LCD

Panels to customers in Puerto Rico through its corporate-owned retail stores,

through independent retailers located in Puerto Rico, and through its website on

the Internet.  AT&T Mobility also provided wireless communication services and

sold mobile wireless handsets directly to business, government and other

customers in Puerto Rico through both its own sales force and independent sales

agents.  In addition, AT&T Mobility maintained in Puerto Rico inventories of

mobile wireless handsets containing LCD Panels manufactured and sold by

defendants, their co-conspirators, and others, and operated offices and retail stores

in Puerto Rico.  During the Conspiracy Period, AT&T provided various wireline

telecommunications services to businesses and government customers in Puerto

Rico, where AT&T employees used notebook computers and desktop monitors

purchased by AT&T.  As a result of their presence in Puerto Rico and the

substantial business they conduct in Puerto Rico, AT&T Mobility and AT&T are

entitled to the protection of the laws of Puerto Rico; and,

d.      As a direct and proximate result of defendants' conduct, AT&T Mobility and

AT&T have been injured in their business and property by paying more for LCD

Products purchased from defendants, their coconspirators and others than they

would have paid in the absence of defendants' combination and conspiracy, and

are entitled to relief under Puerto Rico Code 10 LPRA §§ 257, *et seq*. and 31

LPRA § 5141 *et seq*.

198.    By reason of the foregoing, defendants have entered into agreements in restraint of trade

in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq*.

a.      Defendants' conspiracy restrained, suppressed and/or eliminated competition in

the sale of LCD Panels in South Dakota and fixed, raised, maintained and

stabilized LCD Panel prices in South Dakota at artificially high, non-competitive

61

1                          levels;

2          b.      As a result, defendants' conspiracy substantially affected South Dakota

3                  commerce;

4          c.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

5                  substantial volume of business in South Dakota.  AT&T Mobility provided

6                  wireless communication services and sold mobile wireless handsets containing

7                  LCD Panels to customers in South Dakota through its corporate-owned retail

8                  stores, through independent retailers located in South Dakota, and through its

9                  website on the Internet.  AT&T Mobility also provided wireless communication

10                services and sold mobile wireless handsets directly to business, government and

11                other customers in South Dakota through both its own sales force and independent

12                sales agents.  In addition, AT&T Mobility maintained in South Dakota inventories

13                of mobile wireless handsets containing LCD Panels manufactured and sold by

14                defendants, their co-conspirators, and others, and operated offices and retail stores

15                in South Dakota.  During the Conspiracy Period, AT&T provided various wireline

16                telecommunications services to businesses and government customers in South

17                Dakota, where AT&T employees used notebook computers and desktop monitors

18                purchased by AT&T.  As a result of their presence in South Dakota and the

19                substantial business they conduct in South Dakota, AT&T Mobility and AT&T

20                are entitled to the protection of the laws of South Dakota; and,

21          d.      As a direct and proximate result of defendants' conduct, AT&T Mobility and

22                AT&T have been injured in their business and property by paying more for LCD

23                Products purchased from defendants, their coconspirators and others than they

24                would have paid in the absence of defendants' combination and conspiracy, and

25                are entitled to relief under South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

26      199.    By reason of the foregoing, defendants have entered into agreements in restraint of trade

27 in violation of Tennessee Code §§ 47-25-101 *et seq.*

28          a.      Defendants' conspiracy restrained, suppressed and/or eliminated competition in

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the sale of LCD Panels in Tennessee and fixed, raised, maintained and stabilized LCD Panel prices in Tennessee at artificially high, non-competitive levels;

b.    As a result, defendants' conspiracy substantially affected Tennessee commerce;

c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Tennessee. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Tennessee through its corporate-owned retail stores, through independent retailers located in Tennessee, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Tennessee through both its own sales force and independent sales agents. In addition, AT&T Mobility operates one of its principal distribution centers in Memphis, Tennessee, and thus substantial volumes of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others were imported into and moved through Tennessee during and after the Conspiracy Period. AT&T Mobility also operated offices and retail stores in Tennessee. During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses and government customers in Tennessee, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Tennessee and the substantial business they conduct in Tennessee, AT&T Mobility and AT&T are entitled to the protection of the laws of Tennessee; and,

d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Tennessee Code §§ 47-25-101 *et seq.*

200.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2451 *et seq.*

      a.     Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Vermont and fixed, raised, maintained and stabilized LCD Panel prices in Vermont at artificially high, non-competitive levels;

      b.     As a result, defendants' conspiracy substantially affected Vermont commerce;

      c.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Vermont. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Vermont through its corporate-owned retail stores, through independent retailers located in Vermont, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Vermont through both its own sales force and independent sales agents. In addition, AT&T Mobility maintained in Vermont inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Vermont. During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in Vermont, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Vermont and the substantial business they conduct in Vermont, AT&T Mobility and AT&T are entitled to the protection of the laws of Vermont; and,

      d.     As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Vermont Stat. Ann. 9 §§ 2451 *et seq.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

201.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1 *et seq.*

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in West Virginia and fixed, raised, maintained and stabilized LCD Panel prices in West Virginia at artificially high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected West Virginia commerce;

    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in West Virginia. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in West Virginia through its corporate-owned retail stores, through independent retailers located in West Virginia, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in West Virginia through both its own sales force and independent sales agents. In addition, AT&T Mobility maintained in West Virginia inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in West Virginia. During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses and government customers in West Virginia, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in West Virginia and the substantial business they conduct in West Virginia, AT&T Mobility and AT&T are entitled to the protection of the laws of West Virginia; and,

    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1                 Products purchased from defendants, their coconspirators and others than they

2                 would have paid in the absence of defendants' combination and conspiracy, and

3                 are entitled to relief under West Virginia §§ 47-18-1 *et seq.*

4       202.    By reason of the foregoing, defendants have entered into agreements in restraint of trade

5  in violation of Wisconsin Stat. §§ 133.01 *et seq.*

6         a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in

7               the sale of LCD Panels in Wisconsin and fixed, raised, maintained and stabilized

8               LCD Panel prices in Wisconsin at artificially high, non-competitive levels;

9         b.    As a result, defendants' conspiracy substantially affected Wisconsin commerce;

10        c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

11             substantial volume of business in Wisconsin. AT&T Mobility provided wireless

12             communication services and sold mobile wireless handsets containing LCD

13             Panels to customers in Wisconsin through its corporate-owned retail stores,

14             through independent retailers located in Wisconsin, and through its website on the

15             Internet. AT&T Mobility also provided wireless communication services and

16             sold mobile wireless handsets directly to business, government and other

17             customers in Wisconsin through both its own sales force and independent sales

18             agents. In addition, AT&T Mobility maintained in Wisconsin inventories of

19             mobile wireless handsets containing LCD Panels manufactured and sold by

20             defendants, their co-conspirators, and others, and operated offices and retail stores

21             in Wisconsin. During the Conspiracy Period, AT&T provided various wireline

22             telecommunications services to businesses and government customers in

23             Wisconsin, where AT&T employees used notebook computers and desktop

24             monitors purchased by AT&T. As a result of their presence in Wisconsin and the

25             substantial business they conduct in Wisconsin, AT&T Mobility and AT&T are

26             entitled to the protection of the laws of Wisconsin; and,

27        d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and

28             AT&T have been injured in their business and property by paying more for LCD

1   Products purchased from defendants, their coconspirators and others than they

2   would have paid in the absence of defendants' combination and conspiracy, and

3   are entitled to relief under Wisconsin Stat. §§ 133.01 *et seq.*

4   **XI.   PRAYER FOR RELIEF**

5   WHEREFORE, AT&T Mobility and AT&T request:

6   A.   That the unlawful agreement, conduct, contract, conspiracy or combination

7   alleged herein be adjudged and decreed to be:

8   i.   A restraint of trade or commerce in violation of Section 1 of the Sherman

9   Act, as alleged in the First Claim for Relief; and

10   ii.   An unreasonable restraint of trade or commerce in violation of the

11   Cartwright Act, as alleged in the Second Claim for relief; and

12   iii.   In the alternative, an unlawful combination, trust, agreement,

13   understanding, concert of action and/or unfair, deceptive or fraudulent

14   trade practice in violation of the state antitrust and unfair competition laws

15   of Arizona, the District of Columbia, Hawaii, Illinois, Iowa, Kansas,

16   Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New

17   Mexico, New York, North Carolina, North Dakota, Puerto Rico, South

18   Dakota, Tennessee, Vermont, West Virginia and Wisconsin, as well as the

19   Unfair Competition Law of California, as alleged in the Third Claim for

20   relief.

21   B.   That AT&T Mobility and AT&T recover damages, as provided by federal and

22   state antitrust laws, and that a judgment be entered in favor of AT&T Mobility and AT&T against

23   defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

24   C.   That AT&T Mobility and AT&T obtain any penalties, punitive or exemplary

25   damages, and/or full consideration, where the laws of the respective states identified herein so permit;

26   D.   That AT&T Mobility and AT&T recover damages and/or all other available

27   monetary and equitable remedies under the state unfair competition laws identified above;

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

E.     That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     That AT&T Mobility and AT&T be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G.     That AT&T Mobility and AT&T recover their costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and,

H.     That AT&T Mobility and AT&T be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.    **JURY TRIAL DEMAND**

Pursuant to Federal Rules of Civil Procedure Rule 38(b), AT&T Mobility and AT&T demand a trial by jury for all issues so triable.

/

/

/

/

/

/

/

/

/

/

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Dated: 10/20, 2009                    Respectfully submitted,

Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: 213-443-5582
Facsimile: 213-622-2690
Email: jmurray@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile: 202-628-5116
E-mail: jhoward@crowell.com
        jmurphy@crowell.com

Kenneth L. Adams (*pro hac vice*)
R. Bruce Holcomb (*pro hac vice*)
Christopher T. Leonardo (*pro hac vice*)
Christopher H. Wood (*pro hac vice*)
ADAMS HOLCOMB LLP
1875 Eye Street NW
Washington, DC 20006
Telephone: 202-580-8822
E-mail: adams@adamsholcomb.com
        holcomb@adamsholcomb.com
        leonardo@adamsholcomb.com
        wood@adamsholcomb.com

*Counsel for AT&T Mobility, LLC, AT&T Corp.,*
*AT&T Services, Inc., BellSouth*
*Telecommunications, Inc., Pacific Bell Telephone*
*Company, AT&T Operations, Inc., AT&T*
*DataComm, Inc., and Southwestern Bell Telephone*
*Company*